IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| KAYLA CUNNINGHAM, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| MISSOURI CENTRAL TITLE HOLDING CO., LLC, | ) | |
| | ) | |
| Serve at: | ) | |
| | ) | |
| Lisa Dowell, Owner<br>1206 S. Searcy Street<br>Gallatin, Missouri 64640-7102 | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

COMES NOW Plaintiff Kayla Cunningham, individually and on behalf of all others similarly situated, by and through counsel, and for her Complaint against Defendant, states as follows:

**PARTIES**

1. Plaintiff Kayla Cunningham, f/n/a Kayla Bridges[1], is an adult resident of Macon County, Missouri.

2. Defendant Missouri Central Title Holding Co., LLC ("Defendant" or "Missouri Central Title") is a Missouri limited liability company that operates a centralized network of title insurance, escrow, real estate settlement, and related offices throughout Missouri.

3. Defendant employed Plaintiff from June 2023 through at least April 2026. Plaintiff performed substantial work for Defendant in Macon County and Shelby County,

[1] Defendant's payroll records identify Plaintiff under both surnames during the employment relationship.

Missouri.

4. Defendant controlled Plaintiff's work assignments, work locations, timekeeping, payroll, rates of pay, leave usage, and overtime compensation.

5. At all relevant times, Defendant was Plaintiff's "employer" within the meaning of 29 U.S.C. § 203(d) and Mo. Rev. Stat. § 290.500(4).

6. At all relevant times, Plaintiff was an "employee" within the meaning of 29 U.S.C. § 203(e) and Mo. Rev. Stat. § 290.500(3).

**JURISDICTION AND VENUE**

7. This action arises under the Fair Labor Standards Act of 1938 ("FLSA") and the Missouri Minimum Wage Law ("MMWL").

8. This Court has original federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337 and 29 U.S.C. § 216(b).

9. This Court has supplemental jurisdiction over Plaintiff's MMWL claim under 28 U.S.C. § 1367 because that claim forms part of the same case or controversy as Plaintiff's FLSA claim and arises from the same employment relationship, payroll practices, time records, workweeks, and unpaid overtime compensation.

10. Plaintiff brings the FLSA claim in Count I on her own behalf and, under 29 U.S.C. § 216(b), on behalf of other employees similarly situated to her who file written consents to join this action.

11. Plaintiff brings the MMWL claim in Count II on her own behalf and as a class action under Federal Rule of Civil Procedure 23(a) and 23(b)(3).

12. Defendant is and was an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. §§ 203(r) and 203(s)(1)(A). Defendant maintained a multi-office title and settlement operation, had an annual gross volume of sales

made or business done of at least $500,000, and used employees, equipment, communications, banking systems, title underwriting systems, and materials that moved in or affected interstate commerce.

13. Plaintiff was also individually engaged in commerce. In performing Defendant's title, escrow, closing, payment, and underwriter work, Plaintiff regularly used interstate instrumentalities that included telephone, email, Internet systems, banking and wire transfer systems, and title underwriting systems.

14. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Macon and Shelby Counties, Missouri.

15. Divisional venue is proper in the Northern Division because Macon and Shelby Counties are within the Northern Division of this District.

## FACTUAL BACKGROUND

### A. Defendant's Centralized Multi-Office Operation

16. Defendant operates a coordinated network of approximately sixteen (16) title offices, including offices doing business as Macon County Title and Shelby County Title.

17. Defendant's offices provide title searches, title commitments and policies, real estate closings, escrow and settlement services, beneficiary deed services, and related work for buyers, sellers, lenders, real estate professionals, and title underwriters.

18. Lisa Dowell is the owner of Defendant, and Lisa Worrell is Regional Business Manager and Paralegal with centralized responsibility over Defendant's employees and payroll.

19. Defendant, through Worrell, performed in a centralized way the payroll and accounting for Defendant's offices, tallying timecards, submitting payroll, processing raises,

tracking and adjusting leave, maintaining personnel records, coordinating benefits, paying bills, handling annual filings, and administering human resource functions.

20. Defendant's central office prescribed how punch card entries became payroll data and how weekly shortages, leave, holidays, and overtime appeared in payroll.

21. For any given pay period, Defendant processes approximately 45 to 50 employees through the same centralized timekeeping and payroll operation and system.

**B. Plaintiff's Employment, Duties, and Work Schedule**

22. Plaintiff began in title insurance around 2018 with American Title and Abstract Company. After acquiring that operation, Defendant employed her beginning in June 2023, when she possessed approximately five years of experience and a title agent license.

23. Defendant assigned Plaintiff to its Macon County and Shelby County offices. Plaintiff normally worked in Macon and traveled to Shelby for closings, coverage, and operational needs.

24. The Macon office ordinarily included Plaintiff and three other employees. The Shelby office ordinarily included one employee whom Plaintiff covered when closings, vacations, or other business needs required her presence.

25. Plaintiff performed Defendant's substantive production and customer service work for these offices. She prepared title commitments and policies, conducted closings, communicated with customers and transaction participants, balanced escrow accounts, paid office bills, submitted information and payments to underwriters, paid premium accounts, and addressed daily title and settlement needs.

26. Plaintiff ordinarily arrived first, left last, opened and closed the offices, handled time-sensitive transactions, and remained responsible for problems during the workday.

27. Plaintiff frequently worked through meal periods while handling closings, customers, escrow issues, title work, and other duties. She also traveled between the Macon and Shelby offices during the workday when business required it.

**C. Plaintiff's Compensation**

28. Defendant hired Plaintiff at an agreed rate of $20.00 per hour. Plaintiff did not agree that a fixed salary would compensate for every hour worked in a workweek, regardless of the number of hours.

29. Plaintiff's first available pay statement, dated July 28, 2023, states "Regular Pay," records 80.00 hours at $20.00 per hour, and reports $1,600.00 in regular earnings.

30. The next statement, dated August 11, 2023, changed the description to "Salary" and reported a $1,600.00 biweekly base. Defendant indicated that Plaintiff would receive $20.00 per hour and an additional $10.00 per hour as "half time" for overtime, which Defendant described by reference to hours over 80 in a biweekly pay period.

31. Defendant did not provide Plaintiff with an offer letter, compensation agreement, fluctuating workweek agreement, exemption notice, or other writing stating that a fixed weekly salary compensated for all hours worked, and this was not the practice of Defendant.

**D. Timekeeping, Payroll, and the Shortage Policy**

32. Defendant required employees to clock in and out and retained punch cards and weekly hours showing daily times, breaks, and weekly totals, which also necessarily identify each week exceeding 40 hours.

33. Because time clocks reported either minutes or hundredths of an hour and QuickBooks required hundredths, Defendant's centralized payroll personnel converted time entries in this way for payroll purposes.

34. On August 27, 2025, Worrell sent a companywide email on Defendant's payroll practices. She indicated that offices should be sure to use an online calculator and submit weekly totals in hundredths, attaching Plaintiff's Macon timecard as an example, and stated that the process would make "black and white how each of your paystubs has been broken down."

35. The email described Defendant's policy requiring any employee whose weekly timecard was "short more than 4 hours" (from 40 hours) to identify whether vacation or sick time should cover the shortage "to ensure they receive a full paycheck." This tied a full paycheck to recorded hours, accrued leave, and a reduction if there was not leave time to cover enough hours in a particular work week.

36. Defendant paid only the hourly rate when hours were below 36 with no leave time to account for the shortage to bring the hours up to 40 for the workweek. Defendant required that available leave be used to preserve 40 paid hours for the workweek, or Defendant otherwise paid at the hourly rate for the hours worked.

37. Centralized payroll possessed weekly totals, rates, leave elections and statements, and therefore knew her recorded overtime and compensation along with those of all others similarly situated.

**E. Payroll's Pay Descriptions**

38. Plaintiff's statements alternated between "Regular Pay" and "Salary" while Defendant used nominal hourly rates for leave and overtime. From August through December 2023, Defendant generally paid Plaintiff $1,600.00 biweekly corresponding to 80 hours at $20.00 per hour.

39. Beginning January 26, 2024, Defendant reduced the salary line to zero and used Regular Pay calculated from recorded hours at $20.00. Through June 2024, statements separately listed regular, holiday, vacation, or bereavement hours, the $20.00 rate, and Other Earnings.

40. In July 2024, Defendant resumed the salary label and raised Plaintiff's hourly rate to $21.00. The most standard pay became $1,680.00, equal to 80 hours at $21.00, and Defendant used that hourly rate to value vacation, holiday, and other paid leave. Regardless of labeling, the policy and practice remained consistent as to the use of the hourly rate and payment for less than the full 40 hours per week in the situations described above.

41. By 2026, Plaintiff's hourly rate was $23.50 and the most common biweekly pay was $1,880.00, equal to 80 hours at $23.50. Statements continued to list leave benefit hours at $23.50, to show varying pay based on time worked, and to report Other Earnings.

42. The relationship among Plaintiff's rates, the 80-hour base, leave entries, and Other Earnings shows that the salary label did not replace the hourly compensation structure.

**F. Reductions and Leave Reallocations**

43. Defendant did not pay Plaintiff the same pay each work week regardless of the number of hours worked, however few or many.

44. Plaintiff's pay statements show the calculation of weekly pay that varied according to recorded work time and paid leave and benefit availability.

45. For the pay period ending January 19, 2024, the January 26 statement reported 65.17 hours of Regular Pay at $20.00, totaling $1,303.40, plus 8.00 holiday hours totaling $160.00. The $1,463.40 payment was $136.60 below the $1,600.00 base amount, a difference corresponding to 6.83 hours at $20.00. This is obviously not salary compensation.

46. For the pay period ending March 15, 2024, the March 22 statement reported 78.27 hours of Regular Pay at $20.00, totaling $1,565.40, with no salary, paid leave, or Other Earnings. The $34.60 reduction from the standard base corresponds to 1.73 hours at $20.00.

47. In other periods, Defendant used leave to restore the standard base. For the period ending June 7, 2024, it reported 66.28 regular, 8.00 holiday, and 5.72 bereavement hours at $20.00, totaling 80.00 hours and $1,600.00.

48. For the period ending December 20, 2024, Defendant reported $1,583.40 in salary and $96.60 for 4.60 bereavement hours at $21.00, totaling the standard $1,680.00. For the period ending March 27, 2026, it reported $1,715.03 in salary and $164.97 for 7.02 vacation hours at $23.50, totaling the standard $1,880.00. These reallocations were based on Defendant's policy to use leave time to ensure a full paycheck.

49. For the period ending April 10, 2026, the April 17 statement reported $1,095.57 in salary and $470.00 for 20.00 vacation hours at $23.50, totaling only $1,565.57. The $314.43 reduction from the standard $1,880.00 base corresponds to approximately 13.38 hours at $23.50.

50. The April 17 statement did not reflect a reduction based on an FMLA calculation, a disciplinary deduction for willful absence or tardiness, or a deduction for violating a major work rule. Defendant applied its shortage policy during this weekly work period, in that, when recorded time and elected leave did not reach the pay amount for 80 hours biweekly, Defendant paid less than the biweekly base amount. Defendant's policy is irreconcilably inconsistent with a salary paid regardless of hours worked.

**G. Recorded Overtime Workweeks**

51. Plaintiff regularly worked more than 40 hours in a workweek. Defendant's 2024 records include 43.68 hours from February 26 through March 1; 43.62 hours from April 15 through April 19; 42.46 hours from April 22 through April 26; and 43.44 hours from July 8 through July 12. They also include 42.08 hours from July 15 through July 19; 42.22 hours from July 29 through August 2; 41.50 hours from August 5 through August 9; 43.82 hours from August 26 through August 30; 41.47 hours from September 30 through October 4; 41.50 hours

from October 28 through November 1; 40.44 hours from November 4 through November 8; and 41.46 hours from December 2 through December 6.

52. Defendant's 2025 records include 44.45 hours from March 17 through March 21; 43.55 hours from March 24 through March 28; 42.86 hours from April 7 through April 11; 45.44 hours from April 21 through April 25; 42.71 hours from April 28 through May 2; 42.80 hours from June 2 through June 6; and 43.74 hours from June 9 through June 13. They also include 43.95 hours from June 23 through June 27; 42.83 hours from July 7 through July 11; 43.32 hours from July 14 through July 18; 43.55 hours from July 21 through July 25; 42.35 hours from July 28 through August 1; 43.86 hours from August 4 through August 8; and 43.50 hours from August 11 through August 15.

53. These weeks are representative, not exhaustive. Because Defendant collected and converted the weekly time sheets for payroll, it knew each recorded overtime total.

54. Many time sheets report no meal break deduction, showing that some working meal periods were included in recorded elapsed time. The weekly totals therefore provide a minimum measure of overtime.

**H. Defendant's Half-Time Overtime Method**

55. Defendant identified weekly hours over 40 but paid only one half of Plaintiff's hourly rate for those hours under the unexplained label Other Earnings.

56. For the period ending July 19, 2024, Plaintiff recorded 43.44 hours in the first week and 42.08 in the second, totaling 5.52 overtime hours. The July 26 statement reported the standard $1,680.00 base and $57.96 in Other Earnings, equal to 5.52 hours multiplied by $10.50, one-half of the $21.00 hourly rate.

57. For the period ending April 25, 2025, Plaintiff recorded 33.71 hours in the first week and 45.44 in the second. The May 2 statement reported $57.12 in Other Earnings, equal to 5.44 hours multiplied by $10.50.

58. For the period ending February 28, 2025, Plaintiff recorded 35.53 hours in the first week and 40.47 in the second. The March 7 statement reported $4.94 in Other Earnings, the rounded product of 0.47 overtime hours multiplied by $10.50.

59. Pay statements did not list overtime hours or an overtime rate, and did not show the straight-time component for hours over 40 when the base covered only 40 hours per week.

60. This overtime pay practice fails to pay overtime at one and one-half times the regular rate.

61. A half-time overtime payment necessarily requires payment of a fixed salary that cannot vary with hours worked, along with a clear, mutual understanding of the same. Those conditions are wholly absent, as described above, as Plaintiff was not paid a fixed salary that covered all hours worked.

**H. Additional Compensable Work Time**

62. Plaintiff sometimes worked through meal periods while continuing title, escrow, closing, telephone, customer, and office duties rather than being completely relieved. She also traveled between the Macon and Shelby offices after the workday began for closings, coverage, and operational needs, not as an ordinary commute.

63. Defendant knew Plaintiff covered both offices, knew when Shelby closings or absences required travel, and knew that customer and transaction issues could continue through meal periods.

**I. Defendant's Knowledge and Willful Practice**

64. Defendant maintained the records showing Plaintiff's overtime, converted them for payroll, and generated Other Earnings that mathematically matched one half of her hourly rate. It also administered the shortage-and-leave policy and reduced pay according to uncovered hours.

65. In the August 27, 2025 email prescribing the timekeeping and shortage procedures, Worrell identified "continued employer compliance with changing Federal and State labor laws" as a centralized responsibility of Defendant. Defendant possessed the data needed to calculate weekly overtime and continued paying only half time without satisfying that method's requirements.

66. Defendant did not objectively rely on a written compensation agreement authorizing a fixed salary for all hours worked or half-time overtime because no such agreement existed and the agreement in place ran contrary to fixed salary compensation. Its recurring practice from 2023 through at least 2026 resulted from a centralized compensation method, not an isolated arithmetic mistake.

67. As a direct result, Plaintiff received less overtime compensation than the FLSA and MMWL required.

**J. These Common Compensation Practices Affected Similarly Situated Employees**

68. The challenged compensation practices were not confined to Plaintiff. As described above, Defendant applied these same pay shortage practices to approximately 45 to 50 other employees each pay period whose compensation was processed through Defendant's centralized payroll system.

69. Defendant communicated the pay practices at issue companywide. The August 27, 2025 email instructed employees across Defendant's offices.

70. Defendant's payroll records identify each affected employee and the pay practice violations at issue.

**FLSA COLLECTIVE ACTION ALLEGATIONS**

71. Plaintiff brings Count I as an FLSA collective action under 29 U.S.C. § 216(b) on behalf of herself and similarly situated employees (the "FLSA Collective"), including all current and former employees of Defendant who, at any time over the past three years, worked more than forty compensable hours in at least one workweek and were subjected to Defendant's centralized practice of (a) treating weekly pay as reducible when recorded hours and paid leave did not reach the expected weekly or biweekly amount, and/or (b) paying only an additional half-time premium for hours worked over forty per workweek.

72. Plaintiff and the FLSA Collective are similarly situated because Defendant subjected them to a common compensation system administered by the same centralized payroll and management personnel, using the same timekeeping, shortage, leave substitution, base pay, and overtime premium policies and practices.

73. The FLSA claims present common factual and legal questions, including whether Defendant's policies were improper and whether Defendant acted willfully and not in good faith.

74. Those questions can be answered with common proof, including Defendant's companywide communications along with payroll and timekeeping policies and practices.

75. Plaintiff worked within Defendant's operation, submitted time through the same system, was paid through the same centralized payroll, was subjected to the same shortage and leave rules, received the same salary-or-base treatment, and was paid only half time for overtime hours.

76. Defendant's centralized management knew that the practice applied to employees across its offices and continued the practice while maintaining records of weekly overtime, base

reductions, leave substitutions, and half-time premiums.

77. Prompt court-authorized notice is necessary so similarly situated employees may make an informed decision whether to join this action. Defendant possesses the names, last-known mailing addresses, personal and work email addresses, telephone numbers, employment dates, job titles, work locations, and compensation records needed to provide effective notice.

**RULE 23 MISSOURI MINIMUM WAGE LAW CLASS ALLEGATIONS**

78. Plaintiff brings Count II under Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of herself and the following class (the "MMWL Class"): All current and former employees of Defendant who worked in Missouri at any time beginning three years before the filing of this action through final judgment, worked more than forty compensable hours in at least one workweek, and were subjected to Defendant's centralized practices of (a) treating a salary or base amount as reducible when recorded hours and paid leave did not reach the expected weekly or biweekly amount, and/or (b) paying only an additional half-time premium for hours over forty per workweek.

79. The MMWL Class is ascertainable from objective criteria in Defendant's ordinary business records, including employee rosters, payroll records, weekly time records, leave records, pay codes, work locations, and overtime entries.

80. The MMWL Class is sufficiently numerous that joinder of every member is impracticable. Defendant processed approximately 45 to 50 employees through centralized payroll each pay period, and affected employees worked across approximately 16 offices.

81. Questions of law and fact are common to the MMWL Class, including whether Defendant maintained the challenged compensation practices; whether the salary or base was reducible; whether an actual practice of deductions defeated salary-basis treatment; whether a clear mutual understanding necessary for half-time overtime existed; whether Defendant failed to

pay one and one-half times the correct regular rate; and whether class members are entitled to unpaid wages, liquidated damages, attorney fees, costs, and interest under Missouri law.

82. Plaintiff's claims are typical of the MMWL Class because they arise from the same centralized compensation practices and legal theories. Plaintiff and class members were injured in the same manner based on Defendant paying less overtime than the MMWL required.

83. Plaintiff will fairly and adequately protect the MMWL Class. Her interests are aligned with those of the class; she seeks the same statutory relief; and she has no interest antagonistic to the class. Plaintiff has retained counsel experienced in employment and wage and hour litigation who will adequately prosecute the action.

84. The common questions predominate over individualized issues because liability turns on Defendant's uniform policies, centrally maintained records, and common overtime calculations. Any differences in rates, hours, or damages can be resolved through calculations from Defendant's records and do not predominate over the common liability questions.

85. A class action is superior to other available methods because the claims arise from the same centrally administered practice and one proceeding will promote consistent adjudication and efficient use of judicial resources.

86. Managing the MMWL Class presents no unusual difficulty. Defendant's electronic and paper records permit identification of class members, determination of covered workweeks, and calculation of wages and statutory relief.

## COUNT I

### FAILURE TO PAY OVERTIME COMPENSATION
### Fair Labor Standards Act, 29 U.S.C. § 207

87. Plaintiff repeats and realleges the above-stated paragraphs as if fully set forth herein.

88. The FLSA required Defendant to pay Plaintiff overtime compensation at a rate not less than one and one-half times her regular rate for every compensable hour worked over forty in a workweek. 29 U.S.C. § 207(a)(1).

89. Plaintiff was covered by the FLSA through Defendant's enterprise coverage and through Plaintiff's own recurring use of interstate instrumentalities in Defendant's title, escrow, closing, banking, and underwriter work.

90. Plaintiff did not qualify for an exemption from the FLSA's overtime requirement. Defendant's actual compensation practice did not satisfy the salary-basis requirements applicable to the executive or administrative exemptions because Defendant maintained and implemented a practice of reducing pay based on recorded hours and leave. See 29 C.F.R. §§ 541.600, 541.602–.603.

91. The salary-basis test requires an employee regularly to receive a predetermined amount that is not subject to reduction because of variations in the quality or quantity of work performed and the full salary for all weeks in which the employee performs work. 29 C.F.R. § 541.602(a). Defendant's shortage policy, actual reductions, and hourly priced leave reallocations cannot satisfy this standard.

92. Plaintiff and FLSA Collective members who received only half-time premiums were therefore entitled to additional compensation necessary to reach one and one-half times the regular rate for every overtime hour worked.

93. Defendant further failed to pay overtime for compensable hours worked during interrupted meal periods, interoffice travel, pre-opening work, post-closing work, and remote work.

94. Defendant's failure to pay the required overtime compensation to Plaintiff and FLSA Collective members violated 29 U.S.C. § 207(a)(1) in each affected workweek.

95. Defendant's violations affecting Plaintiff and FLSA Collective members were willful within the meaning of 29 U.S.C. § 255(a) because Defendant knew the FLSA applied or acted with reckless disregard for whether its hourly/salary hybrid, companywide shortage deductions, leave substitutions, and half-time method complied with the Act.

96. Defendant cannot establish the subjective and objective good faith required to avoid liquidated damages under 29 U.S.C. § 260. It continued the challenged method as to Plaintiff and other employees despite possessing accurate weekly records and directing centralized personnel to oversee compliance with federal and state labor laws.

97. Under 29 U.S.C. § 216(b), Defendant is liable to Plaintiff and each FLSA Collective member who files a written consent to join.

WHEREFORE, Plaintiff, individually and on behalf of the FLSA Collective, requests conditional certification of the FLSA Collective under 29 U.S.C. § 216(b); an order requiring Defendant promptly to produce in a usable electronic form the names, last-known mailing addresses, email addresses, telephone numbers, employment dates, job titles, work locations, and other contact information for potential collective members; authorization and distribution of a notice and consent form by mail, email, and text message, with a reasonable notice period; unpaid overtime compensation; an equal amount as liquidated damages; application of the three-year limitations period; a service award to the named plaintiff; prejudgment and postjudgment

interest under 28 U.S.C. § 1961; reasonable attorney fees and costs; and such other relief as the Court deems just and proper.

**COUNT II**

**FAILURE TO PAY OVERTIME COMPENSATION**
**Missouri Minimum Wage Law, Mo. Rev. Stat. § 290.505**

98. Plaintiff repeats and realleges the above-stated paragraphs as if fully set forth herein.

99. The MMWL required Defendant to pay Plaintiff at least one and one-half times her regular rate for all hours worked over forty in a workweek. Mo. Rev. Stat. § 290.505.1.

100. Defendant was Plaintiff's employer, Plaintiff was Defendant's employee, and Defendant was subject to the MMWL during the relevant period. Mo. Rev. Stat. § 290.500(3)–(4).

101. Plaintiff and MMWL Class members did not fall within the bona fide executive, administrative, or professional exclusions to the extent Defendant asserts those exclusions.

102. Plaintiff and MMWL Class members worked more than forty compensable hours in affected workweeks, including Plaintiff's representative workweeks identified above.

103. Defendant's payment practice caused Plaintiff and MMWL Class members to receive less in overtime wages than they were entitled to receive under Mo. Rev. Stat. §§ 290.500–.530.

104. Plaintiff and MMWL Class members are entitled to the full amount of unpaid overtime wages, an additional amount equal to double that amount as liquidated damages, and reasonable attorney fees and costs.

105. Plaintiff brings this MMWL action for herself and the MMWL Class.

WHEREFORE, Plaintiff, individually and on behalf of the MMWL Class, requests certification of the MMWL Class under Federal Rule of Civil Procedure 23(a) and 23(b)(3);

entry of judgment establishing Defendant's liability under Mo. Rev. Stat. § 290.505; unpaid overtime wages; an additional amount equal to twice the unpaid wages as liquidated damages; prejudgment and postjudgment interest; a service award to the named plaintiff; reasonable attorney fees and costs; and such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

By: /s/ *Kevin J. Dolley*

Kevin J. Dolley, #54132MO
HKM Employment Attorneys LLP
7382 Pershing Avenue, Suite 1W
St. Louis, Missouri 63130
Telephone/Fax: (314) 642-6577
kdolley@hkm.com

*Attorney for Plaintiff*